**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of the Application of<br>Leandro and Thiago Camargo Ramos<br><br>Applicants,<br><br>For an Order Pursuant to 28 U.S.C. § 1782<br>Directing Discovery for Use in Proceedings In Brazil. | Case No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF THE RAMOS BROTHERS' EX PARTE
APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO
<u>28 U.S.C. § 1782</u>**

Leandro and Thiago Camargo Ramos, by and through counsel, submit this Memorandum of Law in support of their *Ex Parte* Application ("Application") for an order under 28 U.S.C. § 1782(a), directing discovery for use in a foreign proceeding.

**INTRODUCTION**

Brothers Leandro and Thiago Camargo Ramos (the "Ramos Brothers") built their retailing business from a small store into one of Brazil's largest online retailers, known as Kabum. After over twenty years in business, they decided to sell the company, trusting a leading Brazilian M&A bank, Itaú BBA ("Itaú"), to handle the sale. They expected that Itaú and its lead banker, Ubiratan Machado ("Machado"), would find a buyer and negotiate the best deal possible.

Instead, Itaú pushed the Ramos Brothers to sell Kabum to a major Brazilian retailer, Magazine Luiza—on terms that were grossly favorable to Magazine Luiza. Only later did the Ramos Brothers learn that Itaú and Machado had numerous personal and professional conflicts of interest that they ***never disclosed*** to the Ramos Brothers. Among other things, Itaú's Machado was the brother-in-law and best friend of Magazine Luiza's CEO—and on the ***same day*** the Ramos Brothers sold Kabum to Magazine Luiza on Itaú's advice, Itaú served as lead coordinator for

Magazine Luiza on a follow-on offering of stock in Brazil, and Itaú's American affiliate, Itaú BBA USA Securities, Inc ("Itaú USA"), acted as a placement agent for Magazine Luiza's securities in the United States. Not only was Itaú working both sides of the deal, but that follow-on offering directly reduced the Ramos Brothers' consideration from the deal by nearly half a billion US dollars.

The Ramos Brothers now bring this Application to seek evidence in aid of proceedings they intend to bring in Brazil to hold Itaú and Machado responsible for their breaches of duty and conflicts of interest.

## BACKGROUND

### I. The Ramos Brothers Found Kabum and Grow It Into One of Latin America's Largest E-Commerce Companies

The Ramos Brothers are from Limeira, Brazil. In the late 1990s, they started selling computer hardware through a small store, and then created an online sales platform. By the early 2000s, the online business was so successful that they decided to focus entirely on e-commerce—the business that would eventually become known as Kabum.

Over the next two decades, the Ramos Brothers developed Kabum into the largest e-commerce company in Latin America for technology products and games, with approximately 1,500 employees, annual revenues of approximately R$3.5 billion, and net profits of over R$300 million.

### II. The Ramos Brothers Hire Itaú BBA to Help Them Sell Kabum

In around 2019, the Ramos Brothers decided to sell Kabum. (*See* Declaration of José Luiz Bayeux Neto ("Neto Decl.") ¶ 6.) The sale of Kabum was the first and only material M&A transaction the Ramos Brothers had undertaken, so they hired what they believed was the best Brazilian investment bank to be their financial advisor: Itaú, which touts itself as the best M&A

investment bank in Latin America. As Itaú's ads say, "when it's the business of your life, look for Itaú BBA." (Neto Decl., Ex. 2).

Beginning in late 2019, the Ramos Brothers worked with Itaú to seek potential purchasers for Kabum. The M&A Agreement included (i) a mandate authorizing Itaú to represent the Ramos Brothers in negotiating the sale of Kabum with third parties, (ii) an agreement for Itaú to provide advisory services to the Ramos Brothers in negotiating the sale of Kabum, and (iii) an intermediation agreement, through which Itaú would approach parties potentially interested in acquiring Kabum. (*See* Neto Decl. ¶ 6.) Under the terms of this M&A Agreement, Itaú was granted exclusivity as financial advisor to Kabum, and earned 1.35% of the price received by the Ramos brothers, up to R$800 million, plus 0.4% of the price received by the Ramos Brothers in excess of R$800 million. (*Id.* ¶ 8.) In return for this substantial compensation and right of exclusivity, the Ramos Brothers expected—and, under Brazilian law, were entitled to—Itaú's loyalty. (*See id.* ¶ 8.)

Machado, the managing director of Itaú's M&A division, led the mandate. (*Id.* ¶ 7.) The Ramos Brothers believed they were in good hands in entrusting Itaú and Machado with the sale of their life's work. (*See id.* ¶ 6.)

### A. Itaú Pushes the Ramos Brothers to Sell Kabum to Magazine Luiza

Itaú steered the Ramos Brothers to sell Kabum to Magazine Luiza S.A. ("Magazine Luiza"), one of the Brazil's largest retailers. (*See id.* ¶ 10.) Although other parties—including other large companies like Whirlpool, Havan, and Lojas Americanas—were interested in Kabum, the Ramos Brothers later learned that Itaú's M&A group impeded the Ramos Brothers' negotiations with potential purchasers other than Magazine Luiza. (*See id.*) In October 2020, for example, when Havan's CFO contacted Kabum's advisers at Itaú, they falsely told him that Kabum

3

was no longer interested in being acquired but rather exclusively interested in raising funds through an IPO. (*Id.*)

Advised by Itaú, the Ramos Brothers agreed to sell Kabum to Magazine Luiza on July 15, 2021. (*Id.* ¶ 10.) Under the terms of the deal, the Ramos Brothers believed they would receive R$3.5 billion from the sale: R$1 billion in cash and R$2.5 billion would be paid in Magazine Luiza shares. (*Id.* ¶ 11.) But on the *same day*, unknown to the Ramos Brothers until hours before the deal's closing, Magazine Luiza conducted a follow-on offering of 150 million shares, in the value of R$3.5 billion, as well as a private placement of Magazine Luiza securities in the United States and abroad.[1] (*Id.* ¶ 12.) The result of this massive, dilutive issuance was entirely predictable: Magazine Luiza's share price plummeted. (*See id.* ¶ 13.) By the time the Kabum acquisition closed on December 10, 2021, the share price had fallen from approximately R$23.901.86 to approximately R$6.37—cutting the Ramos Brothers' consideration for the acquisition by approximately 75%. (*See id.*)

The Ramos Brothers reluctantly agreed to proceed with the closing of the deal on December 10, 2021, transferring 100% of Kabum's shares to Magazine Luiza and receiving in exchange Magazine Luiza shares worth approximately 1/4 of the originally agreed-upon value. (*See id.* ¶ 13.) Additionally, at the time of closing the sale, the Ramos Brothers paid a commission of over R$15 million to Itaú. (*Id.* ¶ 17.)

**B. The Ramos Brothers Learn of Itaú's Conflicts**

Only after the sale did the Ramos Brothers learn that Itaú had numerous substantial, undisclosed conflicts of interests.

---

[1] The original offering was for roughly R$3.5 billion, but the offering prospectus provided for the possibility of an offering of additional shares resulting in a total value of approximately R$ 4 billion. (Neto Decl. ¶ 12 n.1.)

***First***, not only did Itaú know about Magazine Luiza's follow-on offering, ***but it was the lead coordinating bank*** for that offering, and its US-based affiliate, Itaú USA[2] led coordination efforts in the United States through private placements of Magazine Luiza securities. (*Id.* ¶¶ 13–17.) The follow-on diluted Magazine Luiza shares and thus likely directly resulted in the Ramos Brothers losing half a billion U.S. dollars. (*See id.* ¶13.) It is likely that Itaú pocketed tens of millions of reais for serving as coordinator and placement agent of the very same offering that diluted the Ramos Brothers' acquisition consideration from the deal Itaú had negotiated and advised them to accept. (*See id.* ¶12.)

Itaú ***never disclosed*** the follow-on while it was advising the Ramos Brothers—concealing not only its role but even the plan for such an offering. (*Id.*) After the deal went through, however, Itaú actually *boasted* about its involvement, running ads that showed its logo next to Magazine Luiza's and touting that it had helped sell Kabum *and* managed the follow-on offering on the same day:



The ad, which compares Magazine Luiza, Kabum, and Itaú BBA to a "beard, hair and mustache"—confirms that Itaú knew that Magazine Luiza's acquisition of Kabum and follow-on

---

[2] Itaú USA and Itaú BBA share the same parent company—Itaú Unibanco S/A, a Brazilian bank.

5

offering were all of a piece—just like a beard, hair and mustache are all part of one face. (*See* Neto Decl., Ex. 3, Itaú Beard, Hair, and Mustache Ad.) Yet it did not disclose its role to the Ramos Brothers in the months it worked on these directly related transactions. (*See* Neto Decl. ¶12.) Given Itaú's capital-markets activities in connection with the follow-on (both in Brazil and the United States), it is clear that Itaú had a conflict of interest in ensuring that Magazine Luiza would acquire Kabum even though it was a bad deal for the Ramos Brothers. (*See id.* ¶¶12–16.)

**Second**, Machado—who served as the Ramos Brothers' lead banker—never disclosed that he is the *brother-in-law* and *best friend* of Frederico Trajano, who was (and still is) the CEO of Magazine Luiza and is the son of the company's founder. (*Id.* ¶17.) Itaú's Machado and Magazine Luiza's Trajano have been friends since the early 2000s. (*Id.*) During that time, Machado introduced Trajano to the sister of Machado's then-girlfriend. When both men wed their respective girlfriends, Machado and Trajano became brothers-in-law *in addition* to being best friends. (*Id.*) The Ramos Brothers have also learned through litigation in Brazil that Machado and Trajano frequently travel together to each other's family vacation homes and take international trips together. (*Id.*) On top of these personal connections, the Ramos Brothers have learned that Frederico Trajano was a member of the board of directors of Itaú's parent company until April 2024. (*Id.*)

The Ramos Brothers have also uncovered evidence suggesting that Machado had informally advised Trajano and Magazine Luiza on the acquisition of another e-commerce company, Netshoes, in July 2019—mere months before the Ramos Brothers engaged Itaú BBA to act as their financial advisor in the sale of Kabum. (*Id.*) Notwithstanding these prior connections, in face-to-face meetings and lunches with the Ramos Brothers during the negotiating process, Machado and Trajano acted as though they had only a distant familiarity. (*Id.*)

***Third***, Itaú and Magazine Luiza are 50% partners in a finance company called LuizaCred. (*Id.* ¶18.) LuizaCred does only one thing: finance Magazine Luiza's customers' credit card purchases. (*See id.*) Although Luizacred is nominally based at Magazine Luiza's headquarters in São Paulo, all of Luizacred's directors are Itaú employees. (*Id.*) In fact, five such employees are Itaú executives. (*Id.*) Magazine Luiza and Itaú's relationship through LuizaCred dates back to 2009, when Magazine Luiza and Itaú signed an association agreement whereby Itaú was granted the exclusive rights to provide credit card and financing services for all consumers of Magazine Luiza stores (through LuizaCred) for a period of *twenty* years. (*See id.*) In order to obtain this exclusivity for a period of 20 years, Itaú paid BRL 250 million to Magazine Luiza. (*See id.*)

Relatedly, the Ramos Brothers have discovered that Magazine Luiza has an agreement to act on Itaú's behalf for banking correspondent services. (*Id.* ¶ 19.) Under that agreement, nearly 1,500 Magazine Luiza stores have been offering Itaú financial products, including credit cards, payroll loans, and personal credit to low-income populations. (*Id.*) Itaú is a beneficiary of the sale of these financial products. (*Id.*).

These significant and long-standing conflicts of interest—which gives Itaú a direct financial interest in Magazine Luiza's success—meant that Itaú was incentivized to work for a deal that favored Magazine Luiza, *not* Itaú's clients, the Ramos Brothers. Itaú never disclosed these material, financial relationships to the Ramos Brothers during the negotiations for the sale of Kabum. (*Id.* ¶ 20.)

Itaú and Magazine Luiza's economic ties go even further than their joint venture in LuizaCred. Itaú did not inform the Ramos Brothers that Itaú had also served as lead coordinator of Magazine Luiza's 2019 follow-on and Magazine Luiza's IPO in 2011. (*Id.* ¶ 14.)

### III. The Ramos Brothers Intend to Pursue Legal Proceedings Against Itaú and Machado in Brazil

The Ramos Brothers will hold Itaú and Machado responsible in Brazilian courts, and intend to bring civil claims for (among other things) breaches of duty. They have already initiated litigation connected to the sale of Kabum, both to ensure that Itaú's Machado cannot dissipate assets and to secure discovery for a forthcoming civil litigation.

The pending proceedings include a Production of Evidence suit in the 24th Lower Civil Court of São Paulo (Case No. 1010698-39.2023.8.26.0100) against Machado and Itaú, seeking further evidence of Itaú's conflicts of interests, including information about Machado's compensation and communications with potential acquirors of Kabum. (*Id.* ¶¶ 22–26.) The lower court has granted part of the Ramos Brothers' requested relief and summoned Itaú and Machado to present the contracts requested, noting that the follow-on offering coordinated by Itaú BBA was announced the day after the acquisition of Kabum. (*Id.* ¶ 25; *see also* Neto Decl., Ex. 6.) In its decision, the trial court acknowledged the evidence that Machado and Itaú BBA were conflicted in their roles as financial advisors to the Ramos Brothers in the sale of Kabum to Magazine Luiza. (*Id.* ¶ 25.)

In this discovery proceeding, the Ramos Brothers have sought evidence concerning the role of Itaú USA in the follow-on offering. (*See* Neto Decl. ¶ 24.) Itaú has responded that, as a Brazilian entity, it cannot be responsible for producing documents from its U.S. affiliate. (*See id.* ¶ 25; *see also* Neto Decl., Ex. 7.) The Ramos Brothers accordingly bring this Section 1782 Application for the purpose of obtaining documentary and testimonial evidence for use in forthcoming proceedings against Itaú.

In addition, the Ramos Brothers have filed a "judicial-protest" action against asset transfers filed against Machado in the 1st Lower Civil Court of São Paulo (Case No. 1112853-

23.2023.8.26.0100), which aims to put third parties on notice about the Ramos Brothers' intention to seek damages against Machado for his actions while advising the Ramos Brothers on the sale of Kabum. (Neto Decl. ¶ 27.) On October 29, 2023, the lower court entered judgment in favor of the Ramos Brothers. (*Id.* ¶ 28.; *see also* Neto Decl. Ex. 8.) The court granted the plaintiffs' protest and ordered the issuance of a notice to inform the general public of the Ramos Brothers' claims and that the Ramos Brothers may be entitled to some or all of Machado's assets down the road. (Neto Decl. ¶ 29.) Machado has appealed that ruling to the 20th Chamber of Private Law of the São Paulo State Court of Appeals, which has stayed the lower court's judgment pending outcome of the appeal. (*Id.* ¶ 30.)

## LEGAL STANDARD

Section 1782(a) of Title 28 of the United States Code allows United States district courts to issue orders granting discovery for use in foreign proceedings. In relevant part, the statute provides:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal … The order may be made … upon the application of any interested person[.]

28 U.S.C. § 1782(a).

The "twin aims" of Section 1782 are to (1) "provide efficient means of assistance to participants in international litigation in our federal courts" and (2) "encourage foreign countries by example to provide similar means of assistance to our courts." *Sampedro v. Silver Point Capital, L.P.*, 958 F.3d 140, 143 (2d Cir. 2020) (cleaned up) (quoting *In re Esses*, 101 F.3d 873, 876 (2d Cir. 1996)); *accord Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244 (2d Cir. 2018). To secure discovery pursuant to Section 1782, (1) the request may be made by "any interested person"; (2) the request must seek evidence, whether it be the "testimony or statement"

9

of a person or the production of "a document or other thing"; (3) the evidence must be "for use in a proceeding in a foreign or international tribunal"; and (4) the person from whom discovery is sought must "reside" or be "found" in the district of the district court ruling on the application for assistance." 28 U.S.C. § 1782(a).

If an application satisfies the statutory criteria, the district court may grant the application considering four factors set forth by the Supreme Court in *Intel Corp v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004): (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding" or a non-participant (because the need for § 1782(a) discovery from non-participants in the litigation is greater, whereas discovery from participants "generally is not as apparent" as participants are already subject to the discovery rules of the foreign proceeding); (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, court, or agency" to U.S. federal-court judicial assistance; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is otherwise "unduly intrusive or burdensome." *Id.* at 264–65; *see also Sampedro v. Silver Point Capital, L.P.*, 958 F.3d 140, 143 (2d Cir. 2020).

## ARGUMENT

This Court should grant the Ramos Brothers' Section 1782(a) Application. The Application satisfies every requirement for obtaining relief under the statute, and every discretionary factor weighs heavily in favor of granting the Application.

### I. Section 1782 Authorizes the Court to Grant the Ramos Brothers' Application

The Ramos Brothers' Application satisfies every requirement under Section 1782(a):

*First*, the Ramos Brothers are a party to every foreign proceeding they have brought (and will be a party to future litigation they intend to bring) against Itaú or Machado. (*See, e.g.,* Neto Decl. ¶¶20–34.) Thus, the Ramos Brothers unequivocally qualify as "interested person[s]" in these litigations under Section 1782. *See, e.g.*, *Intel*, 542 U.S. at 256 ("litigants are included among, and may be the most common example of, the 'interested person [s]' who may invoke § 1782").

*Second* the Ramos Brothers seek "testimon[ial] evidence" and "document[ary] evidence," 28 U.S.C. § 1782(a). That is demonstrated by the Ramos Brothers' proposed subpoenas, attached to the Declaration of Vivek Tata ("Tata Decl.") as Exhibit 2 and Exhibit 3, which detail the types of documents and testimonial evidence the Ramos Brothers seek through this Application. (*See* Tata Decl., Exs. 2 and 3.)

*Third*, the evidence the Ramos Brothers seek is "for use in a proceeding in a foreign … tribunal." § 1782(a). The Ramos Brothers will use the information secured in this proceeding in forthcoming civil litigation in Brazil against Itaú and Machado in civil courts in Brazil, which are "foreign tribunals." *See, e.g.*, *In re Ernesto Andrade Grp.*, 23 Misc. 424, 2024 WL 195568, at *1 (S.D.N.Y. Jan. 18, 2024) (noting that a civil court in Brazil was a "foreign tribunal" under Section 1782).

*Fourth*, Itaú USA "resides" or can be "found" in this District because Itaú USA has its principal place of business in New York City,[3] which is within this District. *See In re del Valle Ruiz*, 939 F.3d 520, 531 (2d Cir. 2019) (finding that the "resides" or "found" requirement was satisfied where the requirements of general personal jurisdiction were satisfied). Because Itaú USA is at home in this District, the Ramos Brothers may seek Section 1782 discovery from Itaú

---

[3] *See* Tata Decl., Ex. 1, 2024 Itaú USA Finra BrokerCheck Report (noting Itaú USA's "Main Office Location" as 540 Madison Avenue, 24th Floor New York, New York 10022).

11

USA irrespective of any nexus between the discovery sought and Itaú's contacts within this District. *See id.*

Furthermore, Itaú USA has purposefully availed itself of the benefits of operating in this District—and its work in this District is the "primary or proximate reason" that the evidence sought in this Application is available in the first place. *In re del Valle Ruiz*, 939 F.3d at 530. For example, the Ramos Brothers seek evidence relating to Itaú USA's role in facilitating Magazine Luza's follow-on offering in the United States. On information and belief, Itaú USA engaged in many of these investment activities from within New York City. For example, Itaú worked with a New York-based law firm Simpson Thatcher & Barlett LLP, and New York-based securities firms, like J.P. Morgan Securities LLC and Goldman Sachs & Co. LLC, to offer Magazine Luiza securities to certain institutional investors within the United States. (*See* Neto Decl., Ex. 4, Simpson Thatcher Update.)

Accordingly, because the Ramos Brothers satisfy each of Section 1782's statutory criteria, the Court is authorized to grant the Ramos Brothers' 1782 Application.

## II. Each *Intel* factor favors granting the Ramos Brothers' Application

The Court should grant the Ramos Brothers' Application because each of the four discretionary *Intel* factors weighs decisively in the Ramos Brothers' favor. 542 U.S. at 264–65.

*First*, Itaú USA—a distinct U.S.-based legal entity from Itaú BBA—is not a participant in any of the claims the Ramos Brothers have brought or will bring in Brazil. Accordingly, because Itaú USA is a non-participant in those litigations and is likely "outside the [Brazilian] tribunal's jurisdictional reach," Itaú USA's "evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.* Indeed, Itaú has *itself* argued that it does not have certain documents concerning Itaú USA, and has emphasized that Itaú BBA and Itaú USA are separate entities.

*Second*, Brazilian courts will be "[]receptive to materials produced pursuant to this Application." *See In re Ernesto Andrade Grp.*, 2024 WL 195568, at *2; *see also See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995) ("[A] district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782."). Recognizing that Brazilian courts welcome evidence secured through Section 1782 applications like this one, "[c]ourts in this [D]istrict recently have granted requests for section 1782 discovery for use in Brazilian proceedings." *In Re Ibiuna Credito Gestao de Recursos Ltda.*, No. 24-MC-0013 (JGK) (RFT), 2024 WL 1077559, at *8 (S.D.N.Y. Feb. 14, 2024).

*Third*, there is no reason to think that the Ramos Brothers are "attempting to circumvent foreign evidentiary restrictions." *In re Ernesto Andrade Grp.*, 2024 WL 1077559, at *9. On the contrary, the Ramos Brothers require judicial assistance under Section 1782 because the evidence they seek is within the United States and may be outside the jurisdiction of any Brazilian tribunal to obtain, and there is no prohibition from any Brazilian court on seeking this evidence. The Ramos Brothers make this application to seek evidence from Itaú USA, not its Brazilian affiliate— which has refused to produce some of the requested evidence in Brazil on the basis that it is located in the United States. Furthermore, the evidence sought through this request accordingly differs from the evidence sought in Brazilian discovery actions.

*Fourth*, and last, the Ramos Brothers' request is neither "intrusive [n]or burdensome." *Intel*, 542 U.S. at 265. Each of the document requests and topics identified for deposition testimony are directly related to Itaú BBA's involvement in the sale of Kabum and Itaú BBA and Itaú USA's coordination of Magazine Luiza's follow-on offering—topics which are clearly limited in time period. Thus, the fourth and final *Intel* factor favors the Ramos Brothers.

### III. The Court Should Grant the Ramos Brothers' Application *Ex Parte*

This Application should be granted *ex parte*. Courts in the Second Circuit "routinely grant" Section 1782 applications submitted *ex parte*. *See In re Tethyan Copper Co. Pty. Ltd.*, No. 21 MISC. 377 (AT), 2022 WL 1266314, at *1 (S.D.N.Y. Apr. 28, 2022) (granting *ex parte* application); *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*."). Allowing the Ramos Brothers to file their application *ex parte* will allow the Ramos Brothers to serve their subpoenas promptly.

Nor will allowing the Ramos Brothers to file *ex parte* prejudice Itaú USA. Itaú USA would be free to file a motion to quash in this Court, and the Court would have an opportunity to decide the issue before Itaú USA would be obligated to provide the requested discovery. *Gushlak*, 486 F. App'x at 217.

### CONCLUSION

The Ramos Brothers' 1782 Application fulfills every statutory requirement, and each *Intel* factor strongly favors granting the Application. The Ramos Brothers therefore respectfully ask this Court to grant their Application.

| | |
|---|---|
| Dated: September 6, 2024<br>New York, New York | **ELSBERG BAKER & MARURI PLLC**<br><br>By: */s/ David Elsberg*<br>David Elsberg<br>Vivek Tata<br><br>*Counsel for Applicants Leandro and Thiago Camargo Ramos* |